**CHLOE S. DILLON**
California State Bar No. 273748
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chloe_Dillon@fd.org

Attorneys for Mr. Morales-Roblero

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>FILADELFO MORALES-ROBLERO,<br><br>                    Defendant. | CASE NO.:  19MJ24442-AHG<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS TO DISMISS, SUPPRESS EVIDENCE, AND GRANT LEAVE TO FILE FURTHER MOTIONS |

## I.     Statement of Facts and Procedural History

According to the discovery produced by the government, on November 20, 2019, Border Patrol Agent Manuel Cervantes was driving an unmarked Border Patrol car, equipped with lights and sirens, on State Route 94. Agent Cervantes was traveling eastbound, at approximately 1:07 p.m., when he saw a man standing next to Call Box #263, which was across the road, on the northside shoulder of the westbound lane. The man was soaking wet, wearing a backpack, and was dressed in a black hoodie and blue jeans. His jeans were covered in debris.

Agent Cervantes activated his emergency lights and approached the man, Mr. Morales-Roblero, with the intention of conducting an immigration inspection. Exh. P. Agent Cervantes questioned Mr. Morales through the window of his car, and he quickly asked if he had any documents to remain in the United States. Agent

1    Cervantes then gave Mr. Morales orders to follow his car as he pulled over.
2    Following further questioning on the side of the road, Agent Cervantes arrested
3    Mr. Morales[1] and transported him to the Brown Field Border Patrol Station.

4         Conditions at Border Patrol stations along the U.S./Mexico border have been
5    described as "inhumane and punitive"—arrestees sleep on a concrete floor in very
6    cold temperatures and receive little food or water. *See* Exs. A, B, and C. One station
7    held 900 people even though its maximum capacity was 125; detainees were
8    frequently forced to wear soiled clothing and stand on toilets in order to have
9    enough air to breathe. *See* Ex. D. In the last year, at least seven children have died
10   after being held in such stations. *See* Ex. E. Mr. Morales suffered through similar
11   conditions.

12        The following day, November 21, 2019, Mr. Morales had his initial
13   appearance and arraignment all while in custody, for a misdemeanor violation of 8
14   U.S.C. § 1325. He met with counsel in a room in a basement parking garage before
15   the hearing. During this meeting, Mr. Morales was shackled and in custody. At the
16   initial appearance, Mr. Morales was also shackled and in custody. At that hearing,
17   the government moved to detain Mr. Morales on the basis that his undocumented
18   status meant that he had no ties to the community and was thus a flight risk. *See*
19   Dkt. No. 5. Magistrate Judge Barry Kurren denied the motion and set conditions of
20   release. *Id.* Mr. Morales was eventually released on modified conditions on
21   January 15, 2020. Dkt. No. 18.

22        Mr. Morales has received a total of 78 pages of discovery from the
23   government, as well as a copy of the video recording of the post-arrest interview.
24   There is still outstanding discovery to be produced.

25

26

27   _____
28   [1] The area of State Route 94 where the arrest took place is approximately 6.5 miles
     north of the border in between Mexico and the United States, and 8 miles west of
     Otay Mesa, California.

## II.   Argument

### A.   The Court should order the preservation of evidence and compel production of discovery.

Mr. Morales, through counsel, has previously requested Rule 16 and *Brady* discovery directly from the government. Mr. Morales moves this Court to order the government to preserve and produce all discovery to which he is owed under Rule 16 and the Constitution. Rule 16 requires the government to produce evidence that "is material to preparing the defense[.]" FED. R. CRIM. PROC. 16(1)(E)(i). Indeed, this rule carries a "low threshold" of materiality, asking only whether information would help to prepare the defense. *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013). This includes material that "simply causes a Defendant to 'completely abandon' a planned defense and 'take an entirely different path.'" *Id.* (quoting *United States v. Doe*, 704 F.3d 1134, 1151 (9th Cir. 2013).

> A defendant needn't spell out his theory of the case in order to obtain discovery. Nor is the government entitled to know in advance specifically what the defense is going to be. The relevant subsection of Rule 16 is written in categorical terms: Upon defendant's request, the government must disclose any documents or other objects within its possession, custody or control that are "material to preparing the defense."

*Hernandez-Meza*, 720 F.3d at 768 (quoting FED. R. CRIM. PROC. 16(a)(1)(E)(i).

This rule applies to evidence helpful to preparing a defense at trial, as well as evidence helpful to pre-trial litigation. Specifically, the Ninth Circuit has repeatedly held that evidence helpful and relevant to pre-trial suppression motions is discoverable under Rule 16. *See, e.g.*, *United States v. Soto-Zuniga*, 837 F.3d 992, 1001 (9th Cir. 2016) (holding that statistics pertaining to an alleged immigration checkpoint was discoverable under Rule 16 as it was relevant to a suppression motion); *United States v. Thomas*, 726 F.3d 1086, 1096–97 (9th Cir. 2013) (holding that various records related to a law enforcement dog relied on to search the defendant were discoverable as relevant to a suppression motion); *United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003) (holding that evidence related

to a dog's training and experience related to a suppression motion was discoverable under Rule 16). Mr. Morales herein addresses certain items of discovery that have yet to be produced.

Mr. Morales requests discovery on whether the National Guard or U.S. military was involved in his case in any way. The National Guard and the U.S. Marines have been deployed to assist in border enforcement, and their involvement may violate the Posse Comitatus Act. *See United States v. Dreyer*, 804 F.3d 1266, 1272–74 (9th Cir. 2015) (en banc) (explaining that the Posse Comitatus Act forbids military personnel from participating in civilian law enforcement activities).

He requests any and all recordings from any surveillance leading up to and including the arrest. This includes any scope video, infrared recording, dispatch tapes, seismic intrusion device photographs, reports, or electronic data, bodycams or dashcams, drone recordings, and citizen's reports, if any exist.

He requests any and all apprehension reports, or other notes taken contemporaneously with the surveillance or arrest of him.

Finally, Mr. Morales requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material, and that the AUSA state on the record that he has done so and complied with his obligations under the law to provide this information. *See Kyles v. Whitley*, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991). Such material includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, and whether or not any disciplinary

1    action was ultimately recommended. Mr. Morales further requests production of
2    any such information at least one week prior to trial.

3    　　　　Mr. Morales also specifically requests disclosure and all information in the
4    government's possession that any agent involved in this case was ever a member
5    of the "I'm 10-15" Facebook group or of another social media group publishing
6    white supremacist or bigoted posts. Media reports have recently shed light on a
7    previously clandestine Facebook group for Border Patrol agents. This group
8    included posts mocking immigrants who died and legislators who inspected
9    immigration detention facilities, among other posts using vulgar and demeaning
10   language and images. *See, e.g.*, A.C. Thompson, *Inside the Secret Border Patrol*
11   *Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*,
12   PROPUBLICA (July 1, 2019), https://www.propublica.org/article/secret-border-
13   patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.
14   Media reports also revealed many law enforcement agents from many agencies who
15   were members of and active in explicitly white supremacist social media groups.
16   *See, e.g.*, Will Carless & Michael Corey, *To Protect and Slur: Inside Hate Groups*
17   *on Facebook, Police Officers Trade Racist Memes, Conspiracy Theories and*
18   *Islamophobia*, REVEAL: CENTER FOR INVESTIGATIVE REPORTING (June 14, 2019),
19   https://www.revealnews.org/article/inside-hate-groups-on-facebook-police-
20   officers-trade-racist-memes-conspiracy-theories-and-islamophobia/.

21   　　　　This information is evidence of bias and is thus required to be produced under
22   Rule 16, *Henthorn*, and *Brady*. Mr. Morales asks the Court to set a deadline for the
23   production of this discovery.

24   **B.    This Court should dismiss the charging document because**
        **Congress violated the non-delegation doctrine when it enacted 8**
25      **U.S.C. § 1325(a)(1).**

26   　　　　Under 8 U.S.C. § 1325(a)(1), Congress has made it a crime for any "alien"
27   to "enter[] or attempt[] to enter the United States at any time or place other than as
28   designated by immigration officers[.]" Congress, then, made it a crime for a non-

citizen to enter, or attempt to enter, the United States during a time or at a place that any immigration officer, including any Border Patrol agent, has not designated for entry. That means whether a defendant's conduct amounts to a crime depends on what an executive-branch official has designated. Congress, then, has delegated to the executive branch the ability to define a criminal provision's scope.

This violates the non-delegation doctrine because Congress has delegated to an executive-branch official the ability to determine the scope of a criminal provision without providing the executive branch official with "an intelligible principle" to guide the official's discretion. *See Mistretta v. United States*, 488 U.S. 361, 372 (1989) (internal quotation marks omitted). As a result, Congress violated the non-delegation doctrine when it enacted § 1325(a)(1). This Court, then, must dismiss this case.

### C. This Court should dismiss the charging document because Congress violated the Due Process Clause's prohibition on vague laws when it enacted 8 U.S.C. § 1325(a)(1).

The government violates the Fifth Amendment's Due Process Clause "by taking way someone's life, liberty, or property" based on a "vague" criminal law. *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Here, § 1325(a)(1) flunks these requirements. As explained above, the scheme Congress and executive-branch officials created in § 1325(a)(1) allows an immigration officer to decide what places and times to designate for entry. An immigration officer can decide what to designate for any reason or no reason at all. This Court, then, must dismiss this case.

**D.   This Court should dismiss the charging document because this prosecution violates equal protection and due process.**

The Court should dismiss the information because this prosecution violates equal protection and due process. Misdemeanor illegal entry under 8 U.S.C. § 1325 is the only petty offense that prosecutors in the Southern District of California do not bring through the Central Violations Bureau ("CVB"). CVB defendants are generally cited and released, receive notice of their court date in the mail, and resolve their charges without a criminal conviction. By contrast, § 1325 defendants are arrested, held in custody, never offered an alternative to a conviction, and always serve some jail time—even though § 1325 defendants have a lower failure-to-appear rate than CVB defendants. This disparate treatment violates equal protection on the basis of alienage, national origin, and race.

This Court can also adjudicate this equal protection claim through the lens of selective prosecution or selective enforcement. The requirements for selective prosecution are met because the U.S. Attorney's disparate treatment of CVB and § 1325 defendants has a discriminatory effect and a discriminatory purpose. The Border Patrol's referral of § 1325 defendants for prosecution in 'regular' court, rather than CVB court, also demonstrates a "policy, plan, or a pervasive pattern" that constitutes selective enforcement. *See Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993).

Furthermore, this prosecution violates procedural and substantive due process. The three-factor procedural due process test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), weighs in favor of dismissal, because the interest in avoiding a loss of liberty and a conviction are substantial, the risk of an erroneous deprivation of these interests is virtually guaranteed, and any costs or administrative burden on the Government are minimal. Finally, substantive due process has been violated because it shocks the conscience to deprive § 1325 defendants of the substantial

benefits of CVB court while extending those benefits to other defendants charged with petty offenses who have an even greater risk of flight.

**E.    This Court should dismiss the charging document because 8 U.S.C. § 1325 violates the due process clause.**

The offense of 8 U.S.C. § 1325 makes it a crime for "any alien" to enter or attempt to enter the United States outside a port of entry. Congress defined the term "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). In *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686, 1700–01 (2017), the Supreme Court held that the statutes transmitting citizenship to children born abroad violate equal protection under the Fifth Amendment's Due Process Clause—they treat children of unwed mothers and unwed fathers differently. Because the citizenship laws create an unconstitutional exception favoring unwed mothers over unwed fathers, and this offense rests on these invalid statutes, the offense is unconstitutional. Thus, this Court must dismiss the charging document.

**F.    This Court should dismiss because the charging document fails to allege all the elements of the charged offense.**

A charging document must include the "essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1). That is, a charging document "must set forth each element of the crime that it charges." *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). A charging document "that tracks the words of the statute violated is generally sufficient" to allege the elements of an offense. *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995). But "implied, necessary elements, not present in the statutory language, must be included in an indictment." *Id*. Thus, if a "statute is silent on mens rea," the government must allege the mens rea in the charging document. *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976). If a charging document fails "to recite an essential element of the charged offense," that is a "fatal flaw requiring dismissal." United States v. Omer, 395 F.3d 1087, 1088 (9th Cir. 2005) (internal quotation marks omitted).

Here, the government charged a violation of the attempt portion of § 1325(a)(1). Its charging document, however, is deficient because it fails to contain the implied mens rea for the attempt portion of § 1325(a)(1). Specifically, it fails to allege that Mr. Morales knew he was an "alien" when he attempted to enter the United States. To convict a defendant of attempted illegal entry in violation of § 1325(a)(1), knowledge of alienage is also required under *Rehaif v. United States*, 139 S. Ct. 2191, 2195–97 (2019). It is further required simply because the offense is charged as an attempt crime. *See States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978); Wechsler, Jones & Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institution: Attempt, Solicitation, and Conspiracy, 61 COLUM. L. REV. 571, 579 (1961). Thus, the charging document fails to allege the elements of the charged offense, and this Court must therefore dismiss it.

### G.   The Court should suppress all evidence obtained a result of the stop in this case, because the agent lacked reasonable suspicion.

#### 1.   Agent Cervantes lacked reasonable suspicion to stop Mr. Morales.

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to seizures of people. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). A law enforcement officer may approach and seize a person for purposes of investigating possible criminal behavior only if that officer has specific facts to form reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1 (1968). Courts look to the totality of the circumstances to determine whether "the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted) (emphasis added). An officer cannot rely on a "mere hunch" to justify a stop. *Id.* at 273–74. Though a government agent may conduct a limited seizure to investigate whether a person is an immigrant without legal documentation, the officer must "provide a rational basis for separating out the illegal alien from American citizens and legal aliens."

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. MORALES'S MOTIONS

1    *Orhorhaghe v. INS*, 38 F.3d 488, 497 (9th Cir. 1994) (internal citations omitted).

2          Neither location nor simple appearance, without sufficient independent cause

3    for suspicion, can create reasonable suspicion that a person is in the United States

4    unlawfully. While officers can consider whether the area is a "high-crime area,"

5    *Terry* still demands individualized suspicion under the totality of circumstances.

6    *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016). Indeed, the Ninth Circuit has

7    held that a location or route frequented by immigrants lacking legal documents, but

8    also by many legal residents, is not sufficient or significantly probative in a

9    reasonable suspicion analysis. *United States v. Ballesteros*, 258 F.3d 1117, 1126

10   (9th Cir. 2002). Moreover, an individual's apparent Latino ethnicity cannot by itself

11   justify an investigative stop in a border area. *United States v. Manzo-Jurado*, 457

12   F.3d 928, 936 (9th Cir. 2006). Most importantly, a court cannot "accept what has

13   come to appear to be a prefabricated or recycled profile of suspicious behavior very

14   likely to sweep many ordinary citizens into a generality of suspicious appearance

15   merely on hunch." *Id.*

16         Here, Agent Cervantes lacked reasonable suspicion to stop Mr. Morales.

17   Agent Cervantes cites the location as the reason for his stop. *See* Ex. P. That is flatly

18   insufficient to justify the stop *Ballesteros*, 258 F.3d at 1126. As such, the Court

19   must suppress all evidence that is a fruit of the illegal stop.

20                     a.    *The Court must suppress all fruits of the illegal stop.*

21         Because the stop here violated the Fourth Amendment, the Court must

22   suppress all fruits from the stop and arrest. It is well established that the Fourth

23   Amendment exclusionary rule applies to statements and evidence obtained as a

24   product of an unlawful detention. *See generally Wong Sun v. United States*, 371

25   U.S. 471 (1963); *see also United States v. Romero-Bustamente*, 337 F.3d 1104 (9th

26   Cir. 2003) (finding Fourth Amendment violation, suppressing alien material

27   witnesses, and requiring dismissal of indictment). "The exclusionary rule has

28   traditionally barred from trial physical, tangible materials obtained either during or

as a direct result of an unlawful invasion." *Wong Sun*, 371 U.S. at 485. It also prohibits introduction of testimony concerning knowledge acquired during an unlawful search or arrest. *See Silverman v. United States*, 365 U.S. 505 (1961). "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Wong Sun*, 371 U.S. at 485 (quoting *Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 392 (1920)). Unless evidence is obtained on the basis of information that was wholly unconnected with the initial unlawful stop, search, or arrest, it must be suppressed. *See Murray v. United States*, 487 U.S. 533, 540 (1988).

Here, the Court must suppress any and all statements, photographs, agent testimony regarding observations of Mr. Morales, or other evidence that was obtained from the stop. Although Mr. Morales's person cannot be suppressed, certainly the Court can, and should, suppress the fingerprints, statements, and other information, as they were wrongfully obtained for an investigative purpose. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 578 (9th Cir. 2005) (recognizing that the proper remedy for having unlawfully obtained the first set of fingerprints is suppression).

**H.   The Court should exclude the field-statement testimony of Agent Cervantes, unless the government complies with the evidentiary rules.**

1.   <u>The government cannot show that Agent Cervantes is a mere language conduit for the introduction of the statements under the hearsay rules.</u>

The out-of-court statements that the government will want to introduce are being offered for the truth of the matter asserted—specifically, that Mr. Morales is a citizen of Mexico and not a citizen of the United States. As such, the statements are hearsay. Fed. R. Evid. 802.

The government intends to introduce these statements under a hearsay exception or exclusion, likely Fed. R. Evid. 801(d)(2) (statement of party

opponent). As the proponent of the evidence, the government bears the burden to establish that it falls within that hearsay exclusion ground. Whether the statement falls within that exclusionary ground is a legal issue that the Court determines when deciding whether or not to admit the evidence. Fed. R. Evid. 104(a).

Mr. Morales was unable to find any cases in which the government introduced statements made in another language without an interpreter present. In all the cases addressing circumstances close to this issue, there was, at a minimum, a purported interpreter (even if that interpreter was an agent of the government). Thus, Mr. Morales can only assume that the government will put forth Agent Cervantes as an interpreter.

Ninth Circuit law is that statements made through a purported interpreter constitute hearsay unless the government is able to establish that the interpreter is a mere "language conduit." *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991). In order to be a language conduit, an interpreter must have (1) sufficient capacity, and (2) no motive to misrepresent. *Id.* Whether statements made through an interpreter should be considered statements of the original declarant "require[s] an analysis of the facts on a case-by-case basis." *United States v. Garcia*, 16 F.3d 341, 342 (9th Cir. 1994). Courts consider "the following four factors ...: (1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, (3) the interpreter's qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated." *United States v. Romo-Chavez*, 681 F.3d 955, 959 (9th Cir. 2012).

Here, the government cannot establish that Agent Cervantes is a mere language conduit, as the factors all weigh against the government. First, the government provided this 'interpreter,' and moreover, Agent Cervantes was primarily acting as a law enforcement officer, not as an interpreter, at the time of these statements. Thus, the first factor tips strongly in favor of Mr. Morales. *See Romo-Chavez*, 681 F.3d at 959-60. Second, this witness is testifying on behalf of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. MORALES'S MOTIONS

the government, and he does have a motive to support the government's case, even if that is not a specific motive to mislead or distort. He has an interest in construing the statements to support the government's case.

As to the third factor, Agent Cervantes is plainly not qualified as an interpreter. *Cf.* Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation.") And taking a class in Spanish at the Border Patrol academy a number of years ago—a course whose purpose is to train individuals to serve as law enforcement officers, not to speak Spanish or serve as interpreters—does not qualify him as such. If Agent Cervantes is qualified to serve as a Spanish interpreter, then any individual who took some high school or college Spanish class is qualified. The fact that Agent Cervantes uses Spanish in his job daily is irrelevant. First, Agent Cervantes is not learning Spanish from the people he arrests. Second, his job as a Border Patrol Agent is not a language immersion environment; Agent Cervantes primarily speaks English when he is on the job. *Cf. Romo-Chavez*, 681 F.3d at 960 (officer grew up in El Paso speaking Spanish, studied it in school, spoke it at home with his wife, and conducted interviews in it on a regular basis).

As to the fourth factor, the actions taken subsequent to the conversation were that Mr. Morales was arrested by Agent Cervantes, reflecting his understanding of the conversation. Mr. Morales took no action in reliance on the conversation. This factor thus does not indicate that both parties took action in reliance on the conversation and does not tip in the government's favor. *Cf. Nazemian*, 948 F.2d at 528; *Garcia*, 16 F.3d at 344.

Evaluating all the factors, Agent Cervantes is not properly considered a mere "language conduit," and as such, the government cannot establish that the statements are Mr. Morales's through Agent Cervantes's interpretation. As such, they are properly excluded because the government has not met its burden as the proponent of the evidence.

### a.    Agent Cervantes is not qualified to testify as an expert.

Agent Cervantes will not be testifying merely to statements he spoke, heard, and perceived. He will instead be employing specialized knowledge in his testimony, in that, he will be translating those statements into English. As such, Agent Cervantes's testimony is more properly considered expert testimony and not lay witness testimony, and the government must qualify Agent Cervantes as an expert.

Lay witness testimony may incorporate an opinion, but that opinion may not be based on specialized knowledge. Fed. R. Evid. 701. The Rules specifically state that an opinion based on specialized knowledge is expert opinion, and thus Agent Cervantes must meet the definition of an expert under Fed. R. Evid. 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Here, the Court, as the trier of fact, will be using Agent Cervantes's specialized knowledge to understand the evidence: specifically, to understand Mr. Morales's statement. It will use that specialized knowledge to determine a fact in issue: whether Mr. Morales is a citizen of another country and not a citizen of the United States. And finally, the government is putting forth Agent Cervantes as someone who has expertise, by virtue of his knowledge, experience, training, and education. As such, the government should have to qualify Agent Cervantes as an expert under the Federal Rules of Evidence, in order to ensure that Agent Cervantes has sufficient knowledge of Spanish and that he has reliably applied that knowledge

in this case.  Without qualifying Agent Cervantes as an expert, any testimony as to any conversation in Spanish with Mr. Morales should be excluded.

2. <u>The Court should suppress the field statements as involuntary.</u>

In accordance with Mr. Morales's constitutional rights, and under 18 U.S.C. § 3501(b), the Court must also determine whether any statements were made voluntarily. The statute provides a list of factors to be considered in determining voluntariness. 18 U.S.C. § 3501(b). And the Court considers the "totality of the circumstances." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc). In addition, under *United States v. Gamez*, in the case of a person who the government considers to be a non-native English speaker, there are additional factors to be considered. 301 F.3d 1138, 1144 (9th Cir. 2002). Looking at all the factors, the Court must suppress any field statements as involuntary.

## I.   The Court should hold an evidentiary hearing.

This Court must make a factual determination as to whether any statement was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Furthermore, an evidentiary hearing in this case is required in order to resolve the Fourth Amendment issue. Where a factual determination is required, courts are obligated to make factual findings. Fed. R. Crim. P. 12; *United States v. Prieto-Villa*, 910 F. 2d 601, 606-10 (9th Cir. 1990). For these reasons, Mr. Morales requests that the Court hold an evidentiary hearing prior to trial in order to resolve preliminary evidentiary issues.

## J.   The Court should grant leave to file further motions as necessary in response to newly-received discovery.

Should Mr. Morales receive discovery after today's date that requires him to submit further motions, he requests leave to do so.

Respectfully submitted,

Dated:  February 27, 2020          *s/ Chloe S. Dillon*
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Morales-Roblero